The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning and welcome. Judge Sung and I would like to thank Judge David Ezra from the United States District Court for the District of Hawaii for serving with us today. He's got such a busy docket, so we're very grateful to him and to his chambers for all the hard work they're doing on behalf of the circuit. Thank you so much, Judge, and thank you for having me. It's an honor. Thank you to everyone from the Pioneer Courthouse for being so welcoming and helpful to all of us visitors. We had four cases set for today. The Mays v. American Hallmark insurance case, submission is deferred pending decision of the Oregon Supreme Court. And the Lemons v. Walgreen pharmacy case has been moved to tomorrow. So we only have two cases on calendar today. Both are being argued. So if counsel for the first case would please come forward and let us know how much time you would like to reserve, please. Good morning, Your Honors. Matthew Bishop for Friends of the Crazy Mountains. If I may, I'd like to reserve five minutes of my time for rebuttal. Okay. Go ahead, please. Your Honors, you've asked the parties in this case to address this court's Ninth Circuit's decision in the Northern Alaska Environmental Center case and its application here. So I'll spend my time this morning addressing that case. And I'd like to start by just really making three points. I think that case is really helpful here for three reasons. One is it really puts a fine point on the central key issue in this case, which is whether or not the previous NEPA analysis that was done is the NEPA analysis for the site-specific project. That's really the dispositive issue here because how you answer that question really resolves the case. If the IBEX project was part of the earlier 2006 Travel Plan EIS or part of the subsequent 2009 EA, then we don't prevail in this case because the statute of limitations is run. And frankly, those issues were never exhausted back then in 2009. If, however, the IBEX project, as revealed to the public for the first time in 2018, is not part of those previous NEPA analysis, then we should prevail because that means they never did NEPA for that particular project, which is required by law. So that's the first point. I think it's helpful in that case. It puts a fine point on that issue. Secondly, Your Honor, I think the Ninth Circuit provides nice, clear instructions for how to resolve that issue. And what they sort of spelled out in that case was, you know, under NEPA and the regulations, proposed actions need to be carefully defined in NEPA documents, and related actions and connected and cumulative actions need to be addressed in a single document. They said instead of looking at sort of the analysis or the plan, just look at the language itself in those documents. Look at the scope of the EIS and the EA to determine whether or not it covers the site-specific action. And I think in this case, Your Honor, when you go back and you look at the 2006 Travel Plan, how the proposed actions defined the scope of it, in that particular case, they clearly spelled out that that was purely decision-making. I have a question. What was your framework? I understand that you are embracing the Northern Alaska Framework. But what was your framework before that focus order? Were you just relying on Kern versus Bureau of Land Management? You know, the framework before had to do more. It actually was very similar. It was looking at what the scope of the old EIS and EA were and comparing it to the scoping notice that was done for the project to say, hey, this project involves four components, different aspects, and none of that is actually in conflict with the Travel Plan. We had a claim in the district court that said they violated the Travel Plan because the trails that they designated were all of a sudden given up. But a lot of the cases, I guess, that the defendants rely on sort of seem to approve that if there's enough similarity in the previous documents. So what would you say you relied on primarily other than Kern for your position? Well, I think even Northern Alaska, I think the law is clear under NEPA that the site, the analysis needs to be specific for a particular project. I think what's interesting in these oil and gas cases are kind of unique because there's sort of a three-tier process where they do a programmatic EIS. And then there's this leasing stage, which is really just a contract stage.  And then subsequent to that, there's a development stage or application for permit to drill. That's when the shovel's in the ground and the NEPA analysis has to be done. So I think it's more of a question of timing on when it's done in those oil and gas cases. And I would say under NEPA and the case law, all of the NEPA cases in this court have made it clear that a specific analysis has to be done. It's more of a question of when. And so like in the Kempthorne case and the Northern Alaska case, I think it was informative that there was going to be a subsequent NEPA before the project actually moved forward. The question was what needed to be done at the leasing stage. But I guess you have Kootenai Tribe of Idaho seems to say that the maps that were previously provided in prior documents would have been sufficient notice to the public. You have other cases like the Timok Tribe of Western. I mean, it just seems like there's a lot of Ninth Circuit case law that says that as long as what was disclosed in a previous document was sufficient notice. So I think that's a great question. The Timok case, I think, is a good one because it is an oil and gas case, and so there was an exception there where they spelled out. At the lease stage, it's very difficult for the project proponents and the agencies to actually do that site-specific analysis. In those cases, they're able to do it. There's a third step, so they're able to do it. I guess, Your Honor, I would suggest in this case, if you kind of take a step back and you look at the 2009 EA, the proposal there wasn't really the IBEX project. They said in the future, it's more like a future project, we are considering moving some portions of the trail to national forest lands. But other than easements, what wasn't disclosed? Like specific easements, what wasn't disclosed? They gave you the beginning point, the end point of the trail. They gave you the map showing the two miles that the trail might be rerouted within. So what wasn't disclosed previously? So they didn't disclose that they were going to be giving up and relinquishing all easement rights on the existing trails that were designated for public use in the travel plan. So that's the Porcupine Low Line. They never disclosed that at all. So the easement exchange, which it was a quid pro quo. The landowners gave an easement and the Forest Service gave up an easement. And they were going to close and remove those trails from all the maps and for use. That was never disclosed. Excuse me. Well, because it has a physical change to the landscape. They're giving up. That's really what my clients were most concerned about was the loss of a century-old trail that used to encircle the crazy mountains that they used. That was part of this scoping notice. So 2018 was the first time the public ever heard about the loss of that trail and those easement interests. That's correct, Your Honor. They did inform the public that we're considering doing this in the future. But there was no detail about where they're going to move the trails. They said they might. They also said in that same statement in that EA that they were going to reconstruct and re-mark the trail as it exists currently. And that's actually what they did. If you look in the project record, the district ranger from 2013 through 2017 was actually out there marking and reworking the trail for the public. That would be unnecessary if they had actually already decided to move it. And I think what's interesting too is, and this is something when I went back and carefully looked after reading Northern Alaska, I went back and looked at the NEPA documents themselves. In the response to comment section on the EA, one of the members of the public said, hey, you probably can't move or do anything with these trails because they're subject to litigation. And that's the Montana wilderness case where the landowners and others challenged the depiction of that trail. And the agency's response was really informative because what they said was, well, the travel plan is not enjoined. It's still in effect. And there's still additional analysis, impacts analysis, we're going to be doing for that work. So that suggests in the 2009 EA that there's actually more work to be done. And I'm actually citing from 3 ER 596 response to comments. That's something I overlooked in the brief. I just didn't see that comment. But I think it's really instructive to suggest that in 2009 they understood there was going to be more analysis to come. They were talking about a future project. And honestly, we couldn't have challenged it. Well, how do you deal with it? I think there's substantial case law in the circuit saying the agency has to be able to prepare an impact analysis in the face of some uncertainty about the specific details of a project, whether it's an oil and gas lease or something else, because we also don't want them to wait until the last minute when essentially the decision is already done. So they have to be able to do an impact analysis not knowing every detail of their plan. Right. Here, essentially, the service is arguing that they forecast within a reasonably narrow range what the action could be and analyze the impact of the potential actions. And they gave the public notice, this is the range of stuff that we're considering. These are the impacts of that potential action. Why wasn't that applying Northern Alaska within the defined scope of that EA in saying, you know, they literally said we're considering moving this trail east to deal with contested easement? That's a great question. I think the answer is that area is a two-mile-wide corridor from open meadows to dense high mountain forests with big-game security. They didn't say anything about giving up trails, relinquishing easement interests, acquiring new easement interests. And they actually said in the trail easement agreement that they were going to do new NEPA. But I guess I'm saying they had that. Giving up the easement is an impact that you're saying had to be analyzed? Yeah. And then their approving counsel said giving up an easement, a property right, a claim even, not an undisputed right, but a disputed claim over an easement, is not something they actually have to analyze under NEPA. Can you respond to that? Yeah, I guess I'm saying it's not only an impact they have to analyze, it's part of the action. What's your authority to that? I would say, Your Honor, that NEPA regulations 1502.4 that basically says all relevant factors or aspects of a decision need to be considered together. It's also a connected action because there's no independent utility for building a new trail unless they're giving up the old one. It's all part of the same decision. And I think it's important for the public. I mean, I think it speaks volumes when they actually did the scoping notice in 2018 and said, here's what we're going to do with the IBEX project, these four things. They got over 80 comments from my clients, many of which fifth-generation Wilsall residents who live in that area. That's the first time they heard about it. The majority of those comments opposed it, said you must do an EA, and were concerned and raised these issues. And that's when they actually canceled the NEPA process. Back in 2009, they got no comments from the public, no opposition, because no one really knew about it. No one knew what was happening because they didn't really tell the public exactly what they were doing. They certainly had the information in 2018 when they did the scoping to know, hey, this is where we're going to put the trail. These are the options, and these are parts of the project. And that's where I feel like there's sort of a fundamental fairness question here is that was a chance for the public. I actually was involved then. I encouraged them to raise their issues because they're going to go through NEPA. They do NEPA on these things all the time. They just finished one on the east side. They did one on the south side. And for them to shut down the NEPA analysis, I think, was really unfair. Can I ask you one question about what you said earlier? You said if the IVEX project was not appropriately disclosed in the 2006-2009 documents, then you would concede the statute of limitations has run. Absolutely. I thought that the defendants had abandoned their statute of limitations time bar argument. They raised it in the first motion to dismiss, and that was denied as moot when you amended the complaint, and it doesn't look like they've re-raised it. But I guess you're not concerned about any abandonment. Well, I guess I feel like, Your Honor, and there's an exhaustion issue there is before, too. I guess I feel like there really wasn't an opportunity to really be informed and raise this issue back in 2009 because I guess our position is this project wasn't part of it. They contemplated in the future maybe moving it, but they never committed to anything back then. It wouldn't have been right for us to raise it. We couldn't have challenged it back then. Well, I think northern Alaska suggests you could have, but I would say also they're distinguishing in northern Alaska between the question of whether some future project is included, fairly included within the notice scope of an earlier EA or EIS. They also note that the plaintiff in that case did not bring a supplementation claim. And from my understanding of the pleadings, there is no supplementation claim here either. Yeah, and, Your Honor, there would have been if when they did the scoping notice. I think it's interesting. If you look at the scoping notice and the frequently asked questions, it doesn't say anything about, hey, we're going to rely on this old. We've already done this in the 2009 EA and the old EIS. If they had, they would have issued the equivalent of a DNA. That was that issue in northern Alaska, four service issues, SIR, Supplemental Information Reports. We would have raised that issue. The question was they were trying to decide to do an EIS, an EA, or issue a CE. That was the issue. And they did four or five pages to the public saying, here's what we're doing. Here's the project. That's the decision. They even have the table decision tree. It was nothing about, you know, hey, we've already done this. We're trying to decide if we need to do more NEPA. If that was the case, then we could have informed, we could have said, hey, listen, there are new information, new circumstances. You need to do a supplemental EIS. But that was never the issue. That only happened well after the fact, post hoc, after the public decision process was done. I think I've run out of time. Sorry. Sorry. I'll ask to go to give you an extra minute for a rebuttal. But I think there's, I guess, do you have any authority for that the scoping notice had to spell out that they were considering whether it was already in the scope of an existing EA or 2000? Well, I guess I think when the scoping notice, Your Honor, came out, the public was sort of taking their word for it. I think the scoping notice speaks for itself to say, hey, everybody was saying, you know, maybe you don't have to do an EIS here, but at the very least you should do an EA. And that's where all the comments were coming in. So I felt like they kind of moved the goalposts after the fact. I felt like they didn't like what they heard, and they got more pushback from the public, particularly my clients, a lot of big game hunters in this area who felt like, hey, you're shutting down very important hunting opportunities for us on these trails, and you should do at the very least an EA and look at different alternatives, one of which would be to re-sign and re-mark the existing trails. All right. Thank you. Thank you, Your Honor. All right. You have 29 seconds left, but we'll give you another minute, and I'll allow any additional questions the panel wants to ask you. May I please have the court. My name is Robert Stockman, here on behalf of the Forest Service. With me at counsel's table is Paige Jilliard, representing the private landowner defendants. I plan to speak for 12 minutes and reserve three minutes for the landowners. We ask this court to affirm the district court, and consistent with the court's order, I will begin with northern Alaska, which, particularly given what was said in the opening argument, I think does resolve this case. First, under northern Alaska, the 2009 EA analyzed and covered the challenge project. Second, if plaintiffs wanted to argue that the identification of a precise route required further NEPA analysis, they needed to argue it, that it presented new information or new circumstances requiring supplementation. And third, plaintiffs are limited at this stage in trying to reach back to the 2009 EA. I think there is a statute of limitations problem. There's also, as they conceded, a forfeiture problem, which is how— But didn't you abandon your statute of limitations issue? You never re-raised it in your amended answer. You never raised it in your answering brief. So I think what—so we didn't present it in our answering brief. I think what happened here is that the case has gotten really winnowed down throughout the appellate process. So there were a number of claims that probably fell within the statute of limitations in district court. But now that we've winnowed it down to this one NEPA claim and really whether the 2009 EA covers the project, I think the statute of limitations does apply. But as we also pointed out, and we did point out in our brief at page 36, there is the forfeiture issue as well, right, that they can't reach back. And that's actually sort of prior to the statute of limitations, right? A plaintiff has to comment during the EA process. They're supposed to file an administrative appeal and then only then go to court. So I guess we didn't invoke that specific doctrine, but we sort of invoked the doctrine that precedes it. So that's our thought on that. But I do want to focus on, at argument, plaintiffs have said that the dispositive issue is whether the 2009 EA covers the project. And now that I fully understand their argument better, I think that means the district court's order should plainly be affirmed, and Northern Alaska answers that question. And we did cite it in our brief, but we should have centered it more now that I've scrutinized it further. In Northern Alaska, this court found that in assessing whether a prior NEPA analysis covers a project, the question is not the adequacy, not the specificity, but rather did it purport to cover that project? And you determine that by looking at the language of the NEPA analysis and its scope. Can I ask you, I am still unclear on which is the better framework, whether just relying on Kootenai and Timok is more appropriate here, or whether Northern Alaska is the more appropriate one? Because Northern Alaska had these lease sales and is talking about a future. It's a little bit more factually, it seems a little bit different because it's just dealing with a framework for lease sales and encompassing a future site-specific lease sale. What do you think? Which alternative is better, or is there even a difference and they're all kind of cohesive? And we don't have to make a choice? I think they all come out to the same place. I think they're all cohesive. Now that I've focused on it more, I think Northern Alaska is very on point. I think one thing that threw me off originally is that it is factually dissimilar, but the dissimilarities actually all make this an easier case than Northern Alaska was. Because Northern Alaska, I think part of what was a little complicated there is it was both a programmatic EIS and a site-specific EIS. And that made it a little less clear what was going on. Here the 2009 EA is site-specific. It identifies projects that are going to be implemented. But, counsel, you're opposing counsels. The whole gravement of his argument appears to me, maybe I'm missing something here, is that the 2009 document doesn't, his argument, doesn't directly address this trail that he's most concerned about, but only in some, according to him, oblique fashion, suggests that that's something we may consider. And he's saying, well, you know, may consider, what does that mean? And this is where we grappled in the briefs. But I think Northern Alaska helps us on this, but also I'll engage on the facts here. I think the key pages in understanding the 2009 EA and how it covered this project are in the excerpts of record at 3.383 and 3.ER.606.01. So in 3.ER.383, there's the scoping notice. And there's attachment B, which is part of the scoping notice. And it goes through each project. And it describes this project. And it says, we're considering relocating the Porcupine Lowline Trail between Ibex and Porcupine Trailheads to correspond with final rights-of-way. It states that portions of the trail may be shifted onto the North Forest land to the east. And both — and the map depicts the location in which this will occur, the corridor in which it will occur. And because it's a scoping notice, it's a little tentative because the agency hasn't made a final decision, right? It's saying, this is what we're thinking about. But as we cited in our brief, by the final decision, the FONSI, it says we will relocate this trail between — Our position is it's covered. I think on its face it's covered. I do think Northern Alaska is helpful here. And what I wish I had emphasized in our brief is that they said to the extent it's unclear or ambiguous, if the agency's interpretation is reasonable that it's covered, then it's covered. And I think at most — I don't even think it's ambiguous. But I think it's the agency's interpretation of this, that it's reasonable this was covered by that scoping notice and that EIA. That's reasonable. It's certainly a reasonable interpretation of the facts. There's a reason why in cases like this we have oral argument. Yes. Yes. No. It's very helpful. Can I ask you, in some of the early documents, it seems like the defendants were thinking about applying a categorical exclusion but then decided not to. And then your briefing is a little bit unclear. You kind of invoke categorical exclusion. But there is none here, correct? There is not a categorical exclusion. Okay. So then why did you invoke it in the briefing? Because if you abandoned it in the process, you really shouldn't be able to now use it, right? Oh, sorry. We didn't mean to imply that this was directly covered by a categorical exclusion decision. But I think what we were arguing, or what I meant to be arguing, is that in the EA they walk through why are these projects, and particularly in the FONSI, they say why don't these projects have a significant environmental impact. And one point that was in the decision document is that a project like this, a reconstruction or construction of a trail, is generally categorically excluded. And the agency said we've already found that this type of project doesn't have significant impacts in most circumstances. So we certainly didn't mean to suggest that a CADEX decision had been made here, but rather that in its analysis the agency pointed out this is the sort of thing we've already found doesn't have significant environmental impacts. But then we went a step further and looked, you know, is this corridor going to raise concerns? We pointed out the potential concerns about sedimentation, other things. We analyzed it and ultimately found it didn't have a significant impact. But I do think the fact the agency has considered this type of project generally as not having a significant impact supports that finding. But you would agree that plaintiffs couldn't challenge a specific easement based on the 2006 or 2009 documents because they hadn't been negotiated yet. So we would agree that to the extent plaintiffs wanted to challenge the precise location, the precise route, they couldn't have raised that back then. I think Northern Alaska addresses that, and this was something I hadn't fully appreciated, and says that's a supplementation issue, right? And we did argue that in our brief at pages 34 to 36. We said, you know, the agency thought about this. It looked back at the EA. It said this covered the project, and everything that was brought to our attention does not require supplementation. There's no new information, new circumstances. And that was the agency's reasoning. And I will say the scoping notice that came out in 2018 did not signal that that was how the agency would go. I mean, scoping is the beginning of the process. But the agency's decision on the final route, which is in 5 ER 909, that is the reasoning the agency gave, right? The agency said we've looked at everything. We think the 2009 EA covers this. Supplementation is not required. But can I ask you, the supplementation is when the new alternative is a minor variation of one of the alternatives discussed in the draft EIS, if that's what you're referring to with supplementation. But that sort of assumes that you had an alternative easement sort of discussed in the EIS, and this is a minor variation from that alternative. But there weren't specific easements discussed, right? Specific routes, no. Yeah, so how would the supplementation apply here? So in some ways this is, in my view, once again a bit of an easier case than some, where they said we're going to relocate this within this area. We will decide the precise location once we've negotiated the rights-of-way. And so this is within the alternative they analyzed. But I do think that when time passes, as here, and when you get a more precise information, the question the agency asks itself is, did our prior analysis cover this? And is there anything new that we know now that requires supplementation? So I think that's the reasoning that we would advocate for. But I will say this is, in some ways this case, we cited cases where the agency, we use that rubric and we think it is helpful, but in some ways those cases often involve more significant changes or more new facts, right? I mean, I think one thing that makes this case a bit unusual is it's actually a very minor project, right? It's a relocation of a trail. It's 10 miles. It's not going to have very significant impacts. They considered everything. So I think that's why some of those other cases that we think help us and do provide the rubric, if anything, they're a little more robust because there was more at issue. And then the final thing I would comment on, just to respond to opposing counsel's argument on the comments, there's two problems about specifically the comments on the 2009 EA. First, Montana, the state of Montana, realized this would potentially impact streams and commented on that and said, please consider this, and the agency committed to doing that. And landowners commented and said, well, we only want you to do this if you get the necessary property rights.  They signaled that people were aware of property rights were at issue. This will involve the relocation of a trail and the potential environmental consequences of that. But also, Northern Alaska says look to the EA or the NEPA analysis, look to its scope. It doesn't say parse through the comments to see if the commenters knew about the project. So I think under Northern Alaska, the 2009 EA covers this project. And I think that disposes of the claims that remain on appeal. There are no further questions. Thank you. Thank you all. We ask the court to affirm. Thank you. Thank you, Your Honor. And may it please the court, Paige Gileard on behalf of the landowners. I'd like to spend my brief time today focusing on a point of clarification that came up during my friend on the other side's time. First, the Forest Service did not own a bonafide property interest across the Zimmerman's land prior to the trail donation agreement. The characterization of this project as involving either an exchange of easement interest or a release of easement interest is simply inaccurate and was properly rejected by the district court. And second, the trail donation agreement did not violate NEPA, and the Forest Service fully complied with NEPA by analyzing the IVEX project and the 2009 EA. I welcome the court's questions. You know, this is an odd one because normally the landowners are on the other side. Yeah, that's right, Your Honor. I think in all the environmental cases I've ever handled in 36 years as a judge, I don't remember any like this. Yeah, this is certainly an unusual posture, but I would say that it highlights the importance of negotiation rather than escalating conflict. So here the Forest Service and my clients were able to reach a beneficial agreement that actually provided guaranteed perpetual public access for the public while also respecting their private property rights. But the plaintiff's argument is that the Forest Service alleged an easement and then gave it up in 2018, right? So then how could they have in 2006 and 2009 challenged a disclaimer that doesn't happen until nine years later or even 12 years later? Are you asking if my clients challenged the depiction of an easement? I'm not sure I understand your question, Your Honor. Well, your clients are arguing that the plaintiffs failed to exhaust. Correct. So I guess I'm wondering how could they have challenged in 2006-2009 something that they're arguing they did not become aware of until 2018? Well, both in 2006 and 2009, the Forest Service recognized that it needed to obtain access for the trail. So especially in 2009, it said that it was going to be moving the trail to correspond to final rights of way and that access needed to be negotiated. It also provided maps that showed where the trail would be located. That was within a very narrow corridor, and indeed the trail that has been built is just it's parallel to where they're alleging the old trail was, and I think it's roughly a mile east. But I think it's important to know, and the District Court did hold, that the Forest Service had no interest in the Zimmerman's property prior to the trail donation agreement. That is now the law of the case, and appellants have elected not to appeal that decision. So their claim that they believe that there was a potential easement is simply insufficient as a matter of law, and it's frankly irrelevant to the NEPA claim. So that would be your response to the argument that the Forest Service had to give notice in 2009 that they were giving up an easement because they did not, in fact, have an easement? That's correct, Your Honor. Thank you. Thank you very much. Thank you. I respectfully request that you affirm the District Court in full. Thank you. How much time would the panel like to give? He has 29 seconds left, but I'm happy to give whatever. We can just go until the panel exhausts their questions. He's got two minutes. Go ahead. He's got two minutes on this. Your Honors, the 2098 doesn't involve the Elk Creek Trail, giving that up. It doesn't involve changing uses. They prohibited motorcycle use later on in the IBEX project. It doesn't involve the easement exchange, giving up easements, requiring easements. And in the easement agreement— Why would not allowing motorcycles have an environmental impact that would require another analysis? I mean, isn't that better for the environment that motorcycles are not going to be used? Well, yeah. I mean, I think that the point there is that they changed the uses that were laid out in the travel plan. There was sort of a loop opportunity for hiking, cross-country skiing. There was a motorcycle use. That was probably the most contentious piece of the landowner. They made changes, I guess what I'm trying to say, with the 2018 scoping that were never involved in the 2009 EA. Would hunters go out there on motorcycles? No, no, they don't. I wouldn't think so. The point I'm trying to make, Your Honor, is that the motorcycle loop was part of the decision earlier, of the IBEX decision. I think that would scare some game away. Definitely. Yeah, definitely. And one point I wanted to make is that in the easement agreement itself, which is in the landowner's SCR 180, paragraph 7, they say they're going to do NEPA. They said—I mean, that's the thing. They never did— They didn't complete any required NEPA now. Then they determined that they didn't need to do any more. But they never did NEPA on giving up the trails, acquiring new easements. That was never analyzed at all or never part of the 2009 EA. And the public never had a chance to weigh in on that. Can I go back to the framework question? Do you agree with opposing counsel that the framework is pretty much all consistent between Kootenai, Timok, and northern Alaska? Or do you view them as separate frameworks and we should adopt northern Alaska versus Kern or something else? I think the overall— I'm still struggling with the framework question. Yeah, I think the overall NEPA framework is consistent and accurate in northern Alaska. And I think Kern, in those cases, say, listen, if you can analyze the impacts of the project, all aspects of it, you must. I think the oil and gas context is a little unique when you're talking about the leasing stage in a contract situation. And I thought the distinction between the Richardson situation and Kempthorne was an interesting one where they said it's contextual. I don't think that applies, Your Honor, necessarily to a trail agreement or new trail movement. They can figure out. They know where the trail is going to go or may go, and they know what they're giving up. So I think it's reasonably foreseeable for them to actually do the analysis. And I think NEPA requires it. So with that, I would ask— There's a case authority that says they couldn't analyze the impacts by saying we expect— we don't know exactly where the new trail is going to go. But if it goes east, these are the potential impacts. It might interfere with the streams. We're going to analyze that. What case on you do they have to be able to pin exactly where the trail is going to go? Well, I don't think they—I think Kern is my best case in terms of you have to analyze a reasonably foreseeable impact. I guess what I would say, Your Honor, is in this case, they never analyzed any impacts. And they talk about the one comment from Montana. Montana basically said, hey, if you're ever going to—in the future, if you decide to do this project and build a trail, there's native Yellowstone cutthroat trout there. You should build bridges. And they actually went ahead and used culverts instead. They never did the analysis on that. So that's an example of where more information would have been helpful. All right, any further questions? Judge Sung? I have none. Thank you. Yeah, thank you. All right, thank you very much. Thank you to all counsel for your very helpful arguments today.
judges: KOH, SUNG, Ezra